Propose Takeover

Monday, June 9, 2025 at 11:59:01 AM Eastern Daylight Time

**Subject:** Fw: Allure Salon Group - Agreements for Transfer of LLC Interests
**Date:** Tuesday, May 27, 2025 at 6:36:38 PM Eastern Daylight Time
**From:** Karen Kaminski
**To:** NICHOLAS RINALDI
**Attachments:** Bountiful Capital - Transfer Agreement - v1.DOCX, A&R Limited Liability Company Operating Agreement - Allure Salon Group, LLC - v2.doc, Bountiful Capital - Written Consent of Members re Transfer Agreement and A&R LLC Agreement - Allure Salon Group - v1.docx, A&R Limited Liability Company Operating Agreement - Allure Salon Group, LLC (Marked).pdf

Get Outlook for iOS

---

**From:** Karen Kaminski <karen@alluresalongroup.com>
**Sent:** Tuesday, May 27, 2025 6:36:15 PM
**To:** karen@alluresalonsuiteconsulting.com <karen@alluresalonsuiteconsulting.com>
**Subject:** Fw: Allure Salon Group - Agreements for Transfer of LLC Interests

Get Outlook for iOS

---

**From:** Corey Dickey <corey@dickeylawoffice.com>
**Sent:** Wednesday, March 26, 2025 9:05:52 PM
**To:** Karen Kaminski <karen@alluresalongroup.com>
**Cc:** David Bao <dbao@bountifulcap.com> <dbao@bountifulcap.com>
**Subject:** Allure Salon Group - Agreements for Transfer of LLC Interests

Karen,

I hope you are well. Please find attached drafts of the requested documents to effect the transfer of a number of your LLC interests to result in you holding 30% of Allure Salon Group, LLC (the "Company") and David (via Bountiful Capital) holding 70% of Allure Salon. For your benefit, below is a list of the attached documents, along with a brief description of each (but such description is not comprehensive and is only summary in nature, so reference should be made to the entirety of the documents for a complete understanding thereof and the revisions thereto):

1. Transfer Agreement – This document effects the transfer of 247.05883 of your existing 600 LLC interests in the Company in exchange for $1, and includes customary representations and warranties by you, including regarding your authority/capacity to enter into the agreement, your title to the LLC interests and no conflicts/consents.

2. Amended and Restated LLC Operating Agreement – This document amends and restates the existing operating agreement of the Company to provide, among other things (including clean-up changes, some of which are to reflect the passage of time and changes in the business), for the

DEFENDANT'S EXHIBIT J.1

day-to-date operations of the business to be managed by David as the "Manager" and sole officer and to reduce all member approval thresholds from 75% to 60%.

3. Written Consent of Members – This document is written consent of the members approving the Transfer Agreement (including the waiver of any requirement to comply with the right of first refusal obligations under the existing operating agreement in connection with the transfer) and the Amended and Restated Limited Liability Company Operating Agreement.

Also attached for your reference is a PDF showing the changes between the existing operating agreement and the draft of amended and restated operating agreement referred to above.

Momentarily after this, I will be following up this email with an email from Dropbox Sign where you and David can sign each of these documents if you both find the attached to be acceptable.

Thanks,

Corey E. Dickey
DICKEY LAW LLC
6375 Penn Ave., Ste. B, #1107
Pittsburgh, Pennsylvania 15206
Office: 773-302-8066
corey@dickeylawoffice.com

# TRANSFER AGREEMENT

THIS TRANSFER AGREEMENT (this "***Agreement***"), is dated as of March 27, 2025, by and between Karen Kaminski, an individual resident of the Commonwealth of Pennsylvania (the "***Transferor***"), and Bountiful Capital, LLC, a Wyoming limited liability company (the "***Transferee***").

## RECITALS

WHEREAS, the Transferor is the record owner of 600.00000 issued and outstanding Limited Liability Company Interests of Allure Salon Group, LLC, a Pennsylvania limited liability company (the "***Company***"), representing 51% of the issued and outstanding Limited Liability Company Interests of the Company (collectively, the "***LLC Interests***"); and

WHEREAS, the Transferor desires to transfer 247.05883 of the LLC Interests (the "***Transferred Interests***") to the Transferee, and the Transferee desires to acquire the Transferred Interests from the Transferor, upon the terms set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, and subject to the terms and conditions set forth herein, the Transferor and the Transferee, intending to be legally bound, hereby agree as follows:

1. **Transfer of Transferred Interests; Purchase Price**. Concurrently with the execution of this Agreement, the Transferor hereby transfers the Transferred Interests to the Transferee, and in full consideration for the transfer of the Transferred Interests, the Transferee shall pay, or cause to be paid, to the Transferor an aggregate amount in cash equal to $1.00.

2. **Representations and Warranties**. The Transferor represents and warrants to the Transferee as follows:

(a) Power and Authority. The Transferor has the capacity and authority to execute and deliver this Agreement, to perform the Transferor's obligations under this Agreement and to consummate the transactions contemplated by this Agreement.

(b) Validity and Enforceability. This Agreement has been duly executed and delivered by the Transferor and, assuming due authorization, execution and delivery by the Transferee, represents the legal, valid and binding obligation of the Transferor, enforceable against the Transferor in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally from time to time in effect and the availability of equitable remedies (regardless of whether enforceability is considered in a proceeding at law or in equity). No further action on the part of the Transferor is or will be required in connection with the transactions contemplated by this Agreement.

(c) Title. The Transferor is the sole and beneficial owner of the Transferred Interests and has good and marketable title to the Transferred Interests, free and clear of all assessments, easements, covenants, conditions, mortgages, pledges, hypothecations, rights of others, rights of first refusal, claims, security interests, encumbrances, title defects, title retention agreements, voting trust agreements, interests, options, liens, charges, adverse claims of ownership or similar restrictions or limitations, including any restrictions on the right to sell, transfer or otherwise dispose of the Transferred Interests (collectively, "***Liens***"). Upon the consummation of the transactions contemplated by this Agreement, the Transferee will acquire good and valid title to the Transferred Interests, free and clear of all Liens.

DEFENDANT'S EXHIBIT
tabbies
J.2

(d) No Conflicts. Neither the execution and delivery of this Agreement by the Transferor nor the performance by the Transferor of the Transferor's obligations under this Agreement will violate or conflict with any law or order.

(e) No Consents. No consent, waiver, approval, authorization, order or permit of, declaration or filing with or notification to any person or entity is required in connection with the execution and delivery by the Transferor of this Agreement or the consummation of the transactions contemplated by this Agreement.

3. **Miscellaneous.**

(a) Survival. All representations, warranties, covenants and agreements set forth in this Agreement will survive the execution and delivery of this Agreement and the closing and the consummation of the transactions contemplated by this Agreement.

(b) No Assignment; Successors and Assigns. Neither party hereto may assign or delegate its rights or obligations under this Agreement without the prior written consent of the other party. This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and permitted assigns.

(c) Severability. Any term or provision of this Agreement that is adjudged invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is adjudged so broad as to be unenforceable, such provision will be interpreted to be only as broad as is enforceable.

(d) Third-Party Beneficiaries. Nothing in this Agreement is intended or will be construed to confer on any person or entity other than the parties hereto or their successors and permitted assigns any rights or benefits under or by reason of this Agreement.

(e) Integration, Modification and Waiver. This Agreement constitutes the entire agreement among the parties hereto, and supersedes all prior understandings of the parties hereto, with respect to the subject matter hereof. No supplement, modification or amendment of this Agreement will be binding unless executed in writing by each of the parties hereto. No waiver of any of the provisions of this Agreement will be deemed to be or will constitute a continuing waiver. No waiver will be binding unless executed in writing by the party making the waiver.

(f) Headings. The headings contained in this Agreement are included for purposes of convenience only, and do not affect the meaning or interpretation of this Agreement.

(g) Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, then this Agreement will be construed as drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring either party by virtue of the authorship of any of the provisions of this Agreement. Unless otherwise indicated to the contrary herein by the context or use thereof: (a) all references to the sections are to the sections of this Agreement; (b) the words "herein", "hereto", "hereof" and words of similar import refer to this Agreement as a whole and not to any particular section or paragraph hereof; (c) masculine gender will also include the feminine and neutral genders, and vice versa; (d) words importing the singular will also include the plural, and vice versa; and (e) the words "include", "including" and "or" will mean without limitation by reason of enumeration.

(h) Governing Law. This Agreement will be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania without regard to principles of conflicts of laws.

(i) Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(j) Further Assurances. Each party hereto will execute and deliver, or cause to be executed and delivered, to the other party such other agreements, documents or instruments, in addition to those required by this Agreement, as such other party may reasonably request, in order to implement the transactions contemplated by this Agreement.

(k) Expenses. All costs and expenses (including all legal, accounting, broker, finder or investment banker fees) incurred in connection with this Agreement and the transactions contemplated hereby are to be paid, in the case of the Transferor, by the Transferor, and, in the case of the Transferee, by the Transferee.

(l) Counterparts; Electronic Signatures; Delivery. This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Execution and delivery of this Agreement by electronic signature (whether digital or encrypted), facsimile or other electronic transmission (including documents in Adobe PDF format, via DocuSign or other similar method) will authenticate this writing and constitute the execution and delivery of a counterpart to this Agreement with the same force and effect as a manual signature, and any such counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes. This Agreement and any additional information incidental hereto may be maintained as electronic records.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement, or caused this Agreement to be duly executed, as of the day and year first above written.

**TRANSFEROR**:

________________________________________

Karen Kaminski

**TRANSFEREE:**

**BOUNTIFUL CAPITAL, LLC**

By: ______________________________

Name: David Bao

Title: President

**ALLURE SALON GROUP, LLC**

**Written Consent of Members Without a Meeting**

**March 27, 2025**

Pursuant to Section 8847(d) of the Pennsylvania Uniform Limited Liability Company Act of 2016 and Section 2.8(e) of the Limited Liability Company Operating Agreement of Allure Salon Group, LLC, a Pennsylvania limited liability company (the "***Company***"), dated as of February 4, 2022 (as amended, modified or supplemented from time to time, the "***LLC Agreement***"), the undersigned, being all of the members of the Company (the "***Members***"), hereby consent in writing by this Written Consent of Members Without a Meeting (this "***Consent***") to the adoption of the following resolutions with the same force and effect as if they had been adopted at a duly convened meeting of the Members:

**Transfer Agreement and Transfer of LLC Interests**

RESOLVED, that the form, terms and provisions of the Transfer Agreement to be entered into by and between Karen Kaminski, an individual resident of the Commonwealth of Pennsylvania (the "***Transferor***"), and Bountiful Capital, LLC, a Wyoming limited liability company (the "***Transferee***"), substantially in the form attached hereto as **Exhibit A** (with such changes, additions and deletions as are authorized hereby, the "***Transfer Agreement***"), and the transactions, other actions and instruments contemplated by or incident to the Transfer Agreement, be, and hereby are, authorized, approved and adopted for all purposes.

FURTHER RESOLVED, that, pursuant to Section 7.5 of the LLC Agreement, the Members waive compliance with Section 7.2, Section 7.3 and Section 7.4 of the LLC Agreement in connection with the transactions contemplated by the Transfer Agreement, including the transfer from the Transferor to the Transferee of the Limited Liability Company Interests contemplated thereby.

FURTHER RESOLVED, that the officers of the Company (the "***Authorized Officers***") be, and each of them hereby is, authorized, empowered and directed to execute and deliver, for and on behalf of the Company, the Transfer Agreement, together with any agreements, documents and instruments in connection therewith, and any exhibits, schedules, annexes and attachments thereto, in each case, with such changes therein, additions thereto or omissions therefrom as such Authorized Officers or any Authorized Officer may deem necessary, advisable or appropriate, such execution and delivery by any such Authorized Officer to be conclusive evidence of such authorization and approval.

**Amended and Restated LLC Agreement**

RESOLVED, that the form, terms and provisions of the Amended and Restated Limited Liability Company Operating Agreement of the Company to be entered into by and between the Members, substantially in the form attached hereto as **Exhibit B** (with such changes, additions and deletions as are authorized hereby, the "***A&R LLC Agreement***"), and the transactions, other actions and instruments contemplated by or incident to the A&R LLC Agreement, be, and hereby are, authorized, approved and adopted for all purposes.

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed to execute and deliver, for and on behalf of the Company, any agreements, documents and instruments to be executed in connection therewith, and any exhibits,

schedules, annexes and attachments thereto, in each case, with such changes therein, additions thereto or omissions therefrom as such Authorized Officers or any Authorized Officer may deem necessary, advisable or appropriate, such execution and delivery by any such Authorized Officer to be conclusive evidence of such authorization and approval.

**General**

RESOLVED, that any actions previously taken or caused to be taken by the Authorized Officers, or any of them, in connection with any of the matters contemplated by the foregoing resolutions are hereby acknowledged to be duly authorized acts performed on behalf of the Company and are hereby ratified, confirmed and adopted as such.

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized and empowered, in the name and on behalf of the Company, to execute and deliver such additional agreements, instruments and documents, and to take or cause to be taken such other actions, as such Authorized Officer or Authorized Officers may determine to be necessary or advisable to implement the purposes and intent of the foregoing resolutions; each such agreement, instrument and document to be in such form and to contain such terms and conditions, consistent with the foregoing resolutions, as such Authorized Officer or Authorized Officers executing the same may approve, the execution and delivery of any such agreement, instrument or document by any such Authorized Officer or the taking of such action to be conclusive evidence of such authorization and approval.

**[Signature Page Follows]**

This Consent may be executed in separate counterparts, each of which shall constitute an original and all of which together shall form a single instrument. Delivery of an executed signature page to this Consent by facsimile or other electronic transmission (including documents in Adobe PDF format) will be as effective as delivery of a manually executed counterpart to this Consent. This Consent shall be effective as of the date first written above when executed by all of the Members in the places designated for their signatures below.

Upon execution of this Consent, the undersigned hereby direct that this Consent be filed in the Company's minute book.

**MEMBERS**:

________________________________
Karen Kaminski

**BOUNTIFUL CAPITAL, LLC**

By: ________________________________
Name: David Bao
Title: President

# Exhibit A

## Form of Transfer Agreement

[attached]

**Exhibit B**

**Form of A&R LLC Agreement**

[attached]

Potential Transfer of 21% shares

# AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "Agreement") is dated this ~~4th~~27th day of ~~February, 2022, relating to~~March, 2025, of **ALLURE SALON GROUP, LLC** (the "Company"), is by and between Karen Kaminski, an individual resident of the Commonwealth of Pennsylvania ("Kaminski"), and Bountiful Capital, LLC, a Wyoming limited liability company ("Bountiful Capital"). Kaminski and Bountiful Capital are sometimes referred to individually as a "Member" and collectively as "Members".

BACKGROUND

A. The Company was formed for the purpose of owning, investing in, managing and further development of salon suites as well as for the purpose of carrying on any other lawful business, purpose or activity which a Pennsylvania limited liability company is not prohibited from carrying on.

B. The Members ~~shall~~ own the entire equity interest in the Company as of the date hereof and wish to protect against ownership of an equity interest in the Company by persons who are not willing or able to carry out the intent of the Members in forming the Company. Accordingly, the Members have agreed to restrict transferability of equity interests and provide for certain other matters relating to the Company, all as is more fully described in this Agreement.

C. This Agreement amends and restates in its entirety that certain Limited Liability Company Operating Agreement, dated as of February 4, 2022, by and between Kaminski and Bountiful Capital.

NOW THEREFORE, the Company and the Members, in consideration of the foregoing and of the mutual covenants contained herein, and intending to be legally bound hereby, agree as follows:

## ARTICLE 1.

## OFFICES

1.1 *Principal Office*. The principal office of the Company shall be located at such place~~,~~ as the Members shall designate from time to time. The Company may have such other offices as the Members may designate or as the business of the Company may from time to time require.

1.2 *Registered Office*. The registered office of the Company, required by the Pennsylvania Uniform Limited Liability Company Act of 2016 (the "Statute") to be maintained in the Commonwealth of Pennsylvania, is 2302 Browning Close, Moosic, ~~Pa~~PA 18507. The registered office may be changed from time to time by action of the Members and by filing the prescribed form with the Pennsylvania Department of State.

1.3 *Filing of Certificates*. ~~The Manager (as hereinafter defined)~~ Kaminski previously caused a Certificate of Organization to be prepared and filed in accordance with the Statute. The Manager (as hereinafter defined) is authorized to file and record any documents required by or appropriate under the laws of any jurisdiction in which the Company shall carry on its business or otherwise necessary or appropriate in connection with the preservation of the limited liability of the Members.

ARTICLE 2.

MEETINGS

2.1 *Annual Meeting*. The annual meeting of the Members shall be held on the first Monday of April each year, beginning with the year January 2022, at the principal office of the Company, or on such other date or at such other place as the Members shall determine, for the purpose of electing Officers (as more fully described in Article 10 ~~herein~~) and for the transaction of such other business as may come before the meeting. If the day fixed for the annual meeting shall not be a business day, such meeting shall be held on the next succeeding business day. If the election shall not be held on the day designated herein for the annual meeting of the Members, or at any adjournment thereof, the Members shall cause the election to be held at a special meeting of the Members as soon thereafter as it may conveniently be held. The failure of the Company to hold any annual meeting on the designated date shall not in any manner render the acts of the Company invalid, or otherwise adversely affect such acts.

2.2 *Regular Meetings*. The Members may, by resolution, prescribe the time and place for the holding of regular meetings and may provide that the adoption of any such resolution shall constitute notice of such regular meetings. If the Members do not prescribe the time and place for the holding of regular meetings, such regular meetings shall be held at the time and place specified by the Manager in the notice of each such regular meeting. The Company may, but shall not be required, to conduct regular meetings.

2.3 *Special Meetings*. Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by the Manager or by any Member. The Company may, but shall not be required to, conduct special meetings.

2.4 *Notice of Meeting*. Written or telephonic notice stating the place, day and hour of any meeting and, in case of a special meeting, the purposes for which the meeting is called shall be delivered not less than five days before the date of the meeting, either personally or by mail, by or at the direction of the Manager, to each Member of record. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the Member at his, her or its address as it appears on the books of the Company, with postage thereon prepaid. When all of the Members of the Company are present at any meeting, or if some, but not all, of the Members are present and those not present sign in writing a waiver of notice of such meeting, or subsequently ratify all the proceedings thereof, the transactions of such meeting are as valid as if a meeting were formally called and notice had been given.

2.5 *Quorum*. At any meeting of the Members, ~~seventy-five~~sixty percent (~~75~~60%) of the LLC Interests (as defined within Section 4.1 ~~of this Agreement~~), represented in person or by proxy, shall constitute a quorum at a meeting of the Members. If less than said percentage of the interests are represented at a meeting, a majority of the interests so represented may adjourn the meeting from time to time without further notice. At such reconvened meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. The Members present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum.

2.6 *Proxies.* At all meetings of Members, a Member may vote by proxy executed in writing by the Member or by his duly authorized ~~attorney-in-fact~~attorney-in-fact. Such proxy shall be filed with the Manager ~~of the Company~~ before or at the time of the meeting. No proxy shall be valid after three months from the date of execution thereof, unless otherwise provided in the proxy.

2.7 *Voting by Certain Members.* Any LLC Interest (as defined within Section 4.1 ~~of this Agreement~~) held in the name of a corporation, partnership or company may be voted by such officer, partner, agent or proxy as the constituent documents of such entity determine. If a Member dies or a court of competent jurisdiction adjudges him or her to be incompetent to manage his or her property, the ~~Member's~~Member's executor, administrator, guardian or personal representative may exercise all of that ~~Member's~~Member's rights for the purpose of settling his or her estate or administering his or her property.

2.8 *Manner of Acting.*

(a) *Formal Action by Members.* Unless otherwise expressly set forth in this Agreement, the affirmative vote of the holders of at least ~~seventy-five~~sixty percent (~~75~~60%) of the LLC Interests (the "Required Majority") shall be the act of the Members.

(b) *~~Three-Fourths~~Special Vote Required.* The affirmative vote or consent of ~~seventy-five~~sixty percent (~~75~~60%) of LLC Interests held by the Members shall be required to authorize a manager, Member, or other person to do any act on behalf of the Company that contravenes the certificate of organization or a written provision of this Agreement, including~~, without limitation,~~ any provision that expressly limits the purpose, business or affairs of the company or the conduct thereof.

(c) *Procedure.* The Manager ~~of the Company~~ shall preside at meetings of the Members. If the Manager is a Member, he, she or it shall have all rights and duties of Members at the meeting, including ~~but not limited to~~ the rights to move or second any item of business and to vote. If the Manager is not a Member, he, she or it shall have no such rights, but he, she or it will preside at the meetings. A record shall be maintained of the meetings of the Members. The Members may adopt their own rules of procedure, which shall not be inconsistent with this Agreement.

(d) *Presumption of Assent.* A Member ~~of the Company~~ who is present at a meeting of the Members at which action on any matter is taken shall be presumed to have assented to the action taken, unless his, her or its dissent shall be entered in the minutes of the meeting or unless he, she or it shall file his, her or its written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by certified mail, return receipt requested, to the secretary of the meeting within five (5) days after the adjournment of the meeting. Such right to dissent shall not apply to a Member who voted in favor of such action.

(e) *Informal Action of Members.* Unless otherwise set forth in this Agreement or otherwise provided by law, any action required to be taken at a meeting of the Members, or any other action which may be taken at a meeting of the Members, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Required Majority.

2.9 *Telephonic/Electronic Meeting.* Members ~~of the Company~~ may participate in any meeting of the Members by means of conference telephone, electronically or by similar

communication if all persons participating in such meeting can hear one another for the entire discussion of the matter(s) to be voted upon. Participating in a meeting pursuant to this Section 2.9 shall constitute presence in person at such meeting.

ARTICLE 3.

FISCAL MATTERS

3.1 *Fiscal Year*. The fiscal year of the Company shall begin on the first day of January and end on the last day of December of each year, unless otherwise determined by resolution of the Members.

3.2 *Deposits*. All funds of the Company shall be deposited from time to time to the credit of the Company in such banks, trust companies or other depositories as the Manager or the Members may select.

3.3 *Checks, Drafts, Etc*. All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness, issued in the name of the Company shall be signed by the Manager or by such Member or Members as the Members may specify.

3.4 *Loans*. No loans shall be contracted on behalf of the Company and no evidences of indebtedness shall be issued in its name unless authorized by a vote of a Required Majority. ~~Notwithstanding the foregoing there are loans currently with Peoples Security Bank that all members are aware of with an aggregate outstanding balance of $165,212.00 (the "Existing Debt").~~

3.5 *Contracts*. The Members may authorize by a Required Majority any Member or agent of the Company to enter into any contract or execute any instrument in the name of and on behalf of the Company.

3.6 *Accountant*. An ~~Accountant~~accountant may be selected from time to time by the Members to perform such tax and accounting services as may, from time to time, be required. The ~~Accountant~~accountant may be removed by a Required Majority without assigning any cause.

3.7 *Legal Counsel*. One or more ~~Attorney~~attorney(s) at ~~Law~~law may be selected by a Required Majority from time to time by the Members as the ~~Company's Legal Counsel~~Company's legal counsel to review the legal affairs of the Company and to perform such other services as may be required and to report to the Members with respect thereto. The ~~Legal Counsel~~legal counsel may be removed by a Required Majority without assigning any cause.

3.8 *Insurance*. The Company has liability insurance on its locations in accordance with the requirements set forth in the various lease agreements. ~~Presently, the Company does not have an Errors and Omissions policy or Fidelity and Surety bonding.~~

ARTICLE 4.

LIMITED LIABILITY COMPANY INTERESTS

4.1 *Limited Liability Company Interests.* Limited Liability Company Interests (the "LLC Interests") are the personal property of each Member representing an equity interest in the Company and may, with the consent of the Required Majority, be evidenced by a Certificate of Limited Liability Company Interest ("LLC Interest Certificate") issued by the Company. Initially, the Company will not issue LLC Interest Certificates and, as of the date hereof, each Member ~~shall receive a~~owns the number of LLC Interests~~ that corresponds to his~~, and has the percentage share in the profits of the Company ("Profit Percentage~~, as~~"), set forth on Schedule A~~, described in Section 5.1 below~~. The Company may issue LLC Interests for cash, property, promissory ~~note~~notes, services performed or to be performed, as incentive compensation, or for any other consideration determined by the Members to be appropriate.

4.2 *Liability of Members.* A Member shall not be liable, solely by reason of being a Member, under an order of a court or in any other manner, for a debt, obligation or liability of the Company of any kind or for the acts of any Member, Manager, officer, agent or employee of the Company.

ARTICLE 5.

CAPITAL MATTERS, DETERMINATION OF PROFIT AND LIQUIDATION PERCENTAGES

5.1 *Initial Contributions.* ~~Set forth in Schedule A hereto opposite the name and address of~~ Each Member's capital contributions ("Capital Contribution") are maintained in the Company's books and records.

~~each Member is, among other things, his or its (i) initial capital contribution ("Capital Contribution"), (ii) number of LLC Interests and (iii) percentage share in the profits of the Company ("Profit Percentage"). The initial Capital Contribution of Kaminski has been heretofore made or shall be made within five (5) business days after request thereof by the Manager. Immediately prior to entering into this Agreement, David Bao, an individual resident of the State of California ("Bao"), assigned that certain Promissory Note, dated January 14, 2022, made by the Company and Kaminski in favor of Bao, as amended by that certain Addendum to Promissory Note, dated January 27, 2022, with an aggregate outstanding balance of $350,000 (the "Member Note"), to Bountiful Capital as a capital contribution. The Company and Kaminski hereby (a) consent to the assignment of the Member Note by Bao to Bountiful Capital, (b) acknowledge and agree that the Member Note is hereby contributed to the Company concurrently with the execution of this Agreement as Bountiful Capital's initial Capital Contribution and (c) immediately following such contribution contemplated by clause (c), the Member Note is hereby cancelled and extinguished in full.~~

5.2 *Capital Accounts.* A capital account (a "Capital Account") shall be established for each Member in the amount of such ~~Member's~~Member's initial Capital Contribution. A ~~Member's~~Member's Capital Account shall be maintained in accordance with Treasury Regulation Section ~~1.704-1~~1.704-1(b)(2)(iv) and shall be increased by:

(a) the amount of any ~~subsequent capital contribution~~Capital Contribution made by such Member subsequent to its initial Capital Contribution; and

(b) the amount of income or gain allocated to such Member pursuant to this

Agreement; and shall be decreased by:

(c) the amount of loss or deduction or ~~non-deductible~~non-deductible expenditure allocated to such Member pursuant to this Agreement; and

(d) the amount of any distribution to such Member.

5.3 *Limit of Liability.* The liability of each Member shall be limited to the aggregate amount of the ~~capital contributions~~Capital Contributions which such Member has made or is otherwise legally obligated to make in accordance with the provisions of this Agreement and the Members shall have no further personal liability to contribute money to, or in respect of, the debts, liabilities, contracts or any other obligations of the Company, nor shall the Members be personally liable for any obligations of the Company.

5.4 *Capital Contributions.* A Member shall not be required to lend any funds to the Company or to make any further ~~capital contribution~~Capital Contribution to the Company after his, her or its initial Capital Contribution ~~is~~has been paid. A Member shall not have any obligation to the Company or to any other Member to restore any negative balance in his ~~capital account~~, her or its Capital Account. No Member may withdraw capital or receive any distributions except as specifically provided herein. No interest shall be paid by the Company on any ~~capital contributions~~Capital Contributions to the Company. In order to obtain additional funds or for other business purposes, the Members may approve additional Capital Contributions to the Company in exchange for additional LLC Interests, at a price per LLC Interest corresponding to the Appraised Value (as hereinafter defined ~~below~~) or such other price as the Members approve.

5.5 *Calculation of Profit Percentages.* The Profit Percentage of each Member shall be determined by dividing such ~~Member's~~Member's total LLC Interests by the total LLC Interests held by all Members.

5.6 *Adjustments to Capitalization Schedule.* At any time that there is an event that would cause the information set forth on Schedule A to become no longer current (such as, but not necessarily limited to, (~~i~~a) the making of additional Capital Contributions by any Member, (~~ii~~b) the admission of new Members, (~~iii~~c) the Transfer (as hereinafter defined) of any LLC Interest, or (~~iv~~d) the issuance of additional LLC Interests to any existing Member), Schedule A shall be deemed to be appropriately modified and adjusted to take into account the event which makes such modification and adjustment necessary. Within a reasonable time after each such event, the Manager shall cause an updated Schedule A to be prepared, which updated Schedule A shall be available for review by the Members at the principal office of the Company.

ARTICLE 6.

ALLOCATIONS OF PROFITS AND LOSSES

6.1 *Net Profits and Losses.* The ~~"~~"Net Profits and Losses of the Company~~"~~" shall be the net profits and losses of the Company for Federal income tax purposes as shown on the returns filed by the Company with the Internal Revenue Service.

6.2 *Allocation of Tax Items.* Net Profit, Net Profit on Sale, Net Loss and Net Loss on Sale

of the Company and each item of income, gain, loss, deduction or credit entering into the computation thereof shall be allocated to the Members in accordance with the Profit Percentages as set forth on Schedule A.

6.3 *Allocations to Reflect Transfers of Interest.* Upon the Transfer (as hereinafter defined) of all or any part of the LLC Interests of a Member as herein provided, Net Profit and Net Loss attributable to the LLC Interests so Transferred shall be allocated between the transferor and transferee as of the effective date of the Transfer, and such allocation shall be based upon the number of days during the applicable fiscal year of the Company that the LLC Interest so transferred was held by each of them, without regard to the results of Company activities during the period in which each was the holder; provided, however, that Net Profit on Sale and Net Loss on Sale attributable to asset sales or other capital events shall be allocated in accordance with the LLC Interests in the Company as held on the date of the asset sale or other capital event giving rise to such Net Profit on Sale or Net Loss on Sale. Distributions shall be made to the holder of record of the LLC Interests on the date of distribution.

ARTICLE 7.

TRANSFER OF LIMITED LIABILITY COMPANY INTERESTS

7.1 *Restrictions on Transfers of LLC Interests.* No Member shall, in any manner, directly or indirectly, convey, sell, transfer, pledge, bequeath, donate, assign, encumber or otherwise dispose of, whether voluntarily or involuntarily, including, but not limited to, pursuant to judicial order, legal process, execution, attachment or otherwise (each such transaction being referred to herein as a "Transfer") any LLC Interest which he, she or it now owns or hereafter acquires, except in accordance with the terms and conditions set forth in this Article 7. Any attempted Transfer of any LLC Interest, or any interest or right therein, made in violation of this Agreement shall be null and void. The transferee of such LLC Interest shall not be entitled to have such LLC Interest Transferred upon the books of the Company, shall have no power to vote such LLC Interest Transferred;, and shall not have any right to participate in any meetings of the Members;, and no person shall be entitled to receive distributions thereon until such Transfer is rescinded.

7.2 *Right of First Refusal.* To the extent any Member (the "Transferring Member") wishes or proposes to Transfer any of his/, her or its LLC Interests (the "Subject Interests"), the Transferring Member must first offer the Subject Interests to the Company (by delivering a written notice to the Company and each other Member) at the Appraised Value or such other price and on such terms and conditions as the Transferring Member and the Company (by approval of the Required Majority) may mutually agree (such price per Subject Interest, the "Sale Price"). For a period of sixty (60) days following written notice from the Transferring Member of the desire to Transfer the Subject Interests, the Company shall have the right to elect to purchase all or any portion of the Subject Interests at a price per Subject Interest equal to the Sale Price by delivering a written notice to the Transferring Member. To the extent the Company does not elect to purchase all of the Subject Securities within such sixty (60) day period, for a period of thirty (30) days following the expiration of such sixty (60) day period (such ninety (90) day period, the "Election Period"), the other Members (first on a pro rata basis and thereafter individually) shall have the right to elect to purchase all or any portion of the Subject Interests that the Company did not elect to purchase at a price per Subject Interest equal to the Sale Price by delivering a written notice to the Transferring

Member. In the event of any election by the Company and/or any Member, the Transferring Member must deliver the applicable Subject Interests to the Company and/or the other Members, as the case may be, free and clear of any liens, and the Company and/or the other Members, as the case may be, must deliver cash consideration for the applicable Subject Securities, at a date and time mutually agreed upon by the parties, but which such closing must occur within ninety (90) days following the expiration of the Election Period. To the extent the Company and the other Members do not elect to purchase all of the Subject Interests, the Transferring Member may, subject to Section 7.4, for a period of one-hundred eighty (180) days thereafter Transfer such remaining Subject Interests to any third party.

7.3 *Drag Rights*. Following compliance by the Transferring Member with Section 7.2, in connection with any Transfer by the Transferring Member that would Transfer to a third party a majority of the then-outstanding LLC Interests, the Transferring Member will have the right to require each other Member to Transfer a portion of such Member's LLC Interests that represents the same percentage of such other Member's LLC Interests as the LLC Interests being sold to the third party by the Transferring Member. All LLC Interests Transferred by each other Members pursuant to this Section 7.3 shall be Transferred on the same terms as the LLC Interests being Transferred by the Transferring Member; provided, however, that no such other Member will be required to (a) make any representations or warranties other than those related to such other Member's authority, ownership and ability to convey title to the applicable LLC Interests or (b) provide any covenants (including with respect to any indemnification obligations) other than the covenant to convey the applicable LLC Interests at the closing of the transaction, free and clear of any liens.

7.4 *Tag Rights*. Following compliance by the Transferring Member with Section 7.2, in connection with any Transfer of LLC Interests by the Transferring Member to a third party, each other Member will have the right to sell a portion of such Member's LLC Interests in such Transfer in an amount equal to: (a) the number of LLC Interests proposed to be sold by the Transferring Member, multiplied by (b) the number of LLC Interests held by such other Member, divided by (c) the aggregate number of LLC Interests then-outstanding. All LLC Interests Transferred by the other Members pursuant to this Section 7.4 shall be Transferred on the same terms as the LLC Interests being Transferred by the Transferring Member; provided, however, that no such other Member will be required to (i) make any representations or warranties other than those related to such other Member's authority, ownership and ability to convey title to the applicable LLC Interests or (ii) provide any covenants (including with respect to any indemnification obligations) other than the covenant to convey the applicable LLC Interests at the closing of the transaction, free and clear of any liens.

7.5 *Transfers with Consent*. A Member may Transfer all or any portion of his, her or its LLC Interests without complying with Section 7.2, Section 7.3 and Section 7.4 if he, she or it shall havehas received the prior written consent of all otherthe Members.

7.6 *Purchase Right of Company Upon Certain Events*. In the event of (a) a Member's Member's death or bankruptcy, or (b) an involuntary Transfer of any LLC Interest (any such transferee thereof, the "Involuntary Transferees") which is or is held to be legally enforceable notwithstanding the provisions of this Section 7.6, then, unless the business of the Company is not continued in accordance with Article 13 below, the Company and the Remaining Members (as hereinafter defined below) shall have the right, but not the obligation, to repurchase the Affected Member'sMember's (as hereinafter defined) and the Involuntary

Transferees' LLC Interests at the Appraised Value~~ (as defined in Section 7.8 below)~~, in which event the Affected Member, or estate of the deceased Affected Member, or Involuntary Transferees in such involuntary Transfer, as the case may be, shall sell the same to the Company and/or the Remaining Members, as the case may be. Any election to repurchase under this Section 7.6 shall be made by the Remaining Members holding a majority of the then-outstanding LLC ~~interests~~Interests held by all Remaining Members and shall be made within ninety (90) days after (i) the Affected Member's or other ~~person's~~person's death or bankruptcy, or (ii) the receipt of notice by the Remaining Members of the involuntary Transfer. Any such repurchase by the Remaining Members shall be made first on a pro rata basis calculated based upon the total LLC Interests held by each such Remaining Member, unless otherwise agreed by the Remaining Members, and thereafter individually. Closing on such repurchase shall occur within twelve (12) months from the date of such death or bankruptcy or involuntary Transfer. If the Company is continued pursuant to Article 13 and the Company and/or the Remaining Members do not make the election to repurchase under this Section 7.6, the Affected Member or, if and as applicable, his, her or its executor, administrator, guardian or other legal representative, or heirs immediately and without any affirmative action by any person shall be deemed to be the Member(s) and the holder(s) of the Affected ~~Member's~~Member's LLC Interest in the Company. If the Company and/or the Remaining Members do not make the election to repurchase under this Section 7.6, the provisions of this Section 7.6 shall again apply in the event that there shall be a subsequent event, which falls within the scope of this ~~paragraph~~Section 7.6. For example, if the Company and/or the Remaining Members do not make an election under this ~~paragraph~~Section 7.6 to repurchase upon the retirement of a Member, the provisions of this Section 7.6 shall again apply upon the death of such Member. The provisions of this ~~paragraph~~Section 7.6 also shall apply to any assignee or transferee of all or any portion of a ~~Member's~~Member's LLC Interest.

7.7 *Termination Events Regarding Members.* In the event of a ~~Member's~~Member's death or bankruptcy, then unless the Company is continued pursuant to Article 13~~ below~~, the Company shall be dissolved in accordance with ~~such~~ Article 13. If the Company is continued pursuant to Article 13, such bankrupt Member or, if and as applicable, his, her or its executor, administrator, guardian or other personal representative, heirs or successors immediately and without any affirmative action by any person shall be deemed to be the assignee(s) of the Member, and therefore shall be deemed to be the holder(s) of the ~~Member's~~Member's LLC Interests~~ in the Company~~.

7.8 *Appraised Value.* In the event that this Agreement requires that an "Appraised Value" be determined, the Manager shall notify the other Members of an intent to value LLC Interests by the appraisal procedure set forth below.

(a) The Affected Member ~~(as defined below)~~ and the Involuntary Transferees, on the one hand, and those Members other than the Affected Member and the Involuntary Transferees (the "Remaining Members"), on the other hand, may agree on the Appraised Value within twenty (20) days from the delivery of the notice of election to establish the Appraised Value. If the Appraised Value is not agreed upon by the Remaining Members, the Affected Member and/or the Involuntary Transferees within twenty (20) days from the delivery of the notice of such election, the Appraised Value shall be determined by two appraisers, one to be selected by the Affected Member (or the Affected Member's Involuntary Transferees, as the case may be) and one to be selected by the Remaining Members; provided, however, if the Remaining Members and the Affected Member (or the Affected Member's Involuntary Transferees, as the case may be) so agree, the Appraised Value may be determined by one appraiser selected jointly by the Remaining Members and the

Affected Member (or the Affected Member's Involuntary Transferees, as the case may be). Each appraiser selected hereunder shall have performed at least two business appraisals for a state or federal court proceeding or a financial institution, within the last two years. Each such appraiser shall be disinterested, objective and without any business dealings with any of the Members prior to his, her or its appointment. The Company and each of the Members shall fully cooperate with each appraiser selected hereunder in order to permit each such appraiser to adequately perform his, her or its appraisal. The Appraised Value shall be the average of the valuations determined by such appraisers; provided, however, that (i) if the difference between the valuations is more than 50% of the lower valuation, then the Appraised Value shall be equal to the average of such valuations plus 10% of such average; (ii) if a party fails to select an appraiser within thirty (30) days from the date of receipt of the written request from the other party for appointment of his appraiser, or if an appraiser fails to submit his, her or its valuation to all Members and the Company within sixty (60) days from the date of his, her or its appointment, then the Appraised Value shall be the valuation of the other appraiser; and (iii) if the parties shall have selected only one appraiser, then the Appraised Value shall be the valuation of such appraiser. The expenses of any such appraisal shall be borne pro rata by the Affected Member (or the Affected Member's Involuntary Transferees, as the case may be) and the Remaining Members, based upon the number of LLC Interests held by them immediately prior to the appraisal; provided, however, if the Remaining Members and the Affected Member (or the Affected Member's Involuntary Transferees, as the case may be) so agree, the Company may bear all costs of the appraisals. To the extent that any right (or the exercise thereof) or obligation of the Company or any Member under this Agreement is dependent upon the determination of the Appraised Value, and any time period associated with such right or obligation expires within five (5) days of the determination of the Appraised Value pursuant to this Section 7.8(a), such associated time period will automatically be extended for a period of ten (10) days following the final determination of the Appraised Value pursuant to this Section 7.8(a).

(b) As used in this Agreement, the term "Affected Member" means the bankrupt Member, the estate or personal representative of a deceased Member, or the transferee in an involuntary Transfer.

~~(c) Notwithstanding the foregoing, in no event shall any Member be entitled to any payment for his/her LLC Interests during the initial 120 months from the date hereof.~~

ARTICLE 8.

BOOKS AND RECORDS; REPORTS AND NOTICES

8.1 *Books and Records*. The Manager shall keep, or cause to be kept, full and accurate books and records of the Company. The books and records of the Company shall be kept at the principal office of the Company or at such other places as the Members shall from time to time determine. To the extent possible and feasible, all books and records can be shared electronically and made available to all Members upon request, so long as such request is not unduly burdensome to the Company.

8.2 *Right of Inspection*. Any Member ~~of the Company~~ shall have the right, upon written demand stating the purpose thereof, to examine for any proper purpose and during normal business hours, the books and records of account, minutes and records of Members and to make copies

thereof. A proper purpose shall mean a purpose reasonably related to such ~~person's~~person's interest as a Member. Such inspection may be made by any agent or attorney of the Member. Upon the written request of any Member ~~of~~, the Company~~, it~~ shall mail to such Member its most recent financial statements, showing in reasonable detail its assets and liabilities and the results of its operations.

8.3 *Financial Records.* All financial records shall be maintained and reported by ~~Frank~~ the Manager or an accountant or other advisor selected by the Manager~~N. Ciero, Certified Public Accountant~~, based on generally accepted accounting principles.

8.4 *Tax Returns.* The Manager shall cause to be prepared and filed all necessary Federal and state income tax returns for the Company, including making the elections described in Section 8.5. Each Member shall furnish to the Manager all pertinent information in its possession relating to Company operations that is reasonably necessary to enable the Company's income tax returns to be prepared and filed.

8.5 *Tax Elections.*

(a) To the extent permitted by applicable tax law, the Company shall make the following elections on the appropriate tax returns and in consultation with the Company's accountant:

(~~1~~i) to adopt the calendar year as the Company's fiscal year;

(~~2~~ii) to adopt the accrual method of accounting and to keep the Company's books and records on the income-tax method;

(~~3~~iii) if a transfer of an LLC Interest as described in Section 743 of the Code occurs, on written request of any transferee Member, or if a distribution of Company property is made on which gain described in Section 734(b)(1)(A) of the Code is recognized or there is an excess of adjusted basis as described in Section 734(b)(1)(B) of the Code, to elect, pursuant to Section 754 of the Code, to adjust the basis of Company properties;

(~~4~~iv) to elect to amortize the organizational expenses of the Company and the start-up expenditures of the Company ratably over a period of sixty (60) months as permitted by Sections 195 and 709(b) of the Code; and

(~~5~~v) any other election the Manager may deem appropriate and in the best interests of the Members.

(b) Neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter I of subtitle A of the Code or any similar provisions of applicable state law, and no provision of this Agreement shall be construed to sanction or approve such an election.

ARTICLE 9.

DISTRIBUTION OF PROFITS

9.1 *Distributions*. Members holding the Required Majority may from time to time declare, and the Company may distribute, accumulated profits agreed by such Members to be not necessary for the cash needs of the ~~Company's~~Company's business. All such amounts shall be distributed to the Members pro rata in accordance with their Profit Percentages.

9.2 *Tax Payment Distributions*. As an exception to the ~~cash distribution~~cash distribution priorities established under Section 9.1, the Members may make distributions to the Members from time to time to fund the payment of ~~income tax~~income tax liabilities (if any) incurred by the Members with respect to taxable income of the Company. Any such distributions ("Tax Payment Distributions") shall be made to all Members pro rata in accordance with their Profit Percentages. Tax Payment Distributions shall be made only from accumulated profits agreed by the Members holding the Required Majority to be not necessary for the cash needs of the ~~Company's~~Company's business (including repayment of Company debt). The timing and amount of Tax Payment Distributions (if any) shall be within the sole discretion of the Members.

9.3 *Repurchases*. Notwithstanding the provisions of Section 9.1 ~~above~~, in the event the Company is entitled to repurchase any LLC Interests of any Member in accordance with this Agreement, the Company may utilize accumulated profits of the Company for such repurchase.

ARTICLE 10.

OFFICERS

10.1 *Manager*. The Manager shall be the ~~Co-Chief~~Chief Executive Officer of the Company responsible (subject to any rights of the Members set forth in this Agreement or the Statute) for the general overall supervision of the day-to-day business and affairs of the Company. The Manager may also have such other titles and hold such other offices as the Required Majority shall so designate (which titles may include, but not necessarily be limited to, president, chairman and/or chief operating officer). ~~She/~~He or she shall, when present, preside at all meetings of the Members. The Manager may sign, on behalf of the Company, such deeds, mortgages, bonds, contracts or other instruments which have been appropriately authorized to be executed by the Members except when the signing or execution thereof shall be expressly delegated by the Members, this Agreement or the Statute to some other ~~Officer~~officer or agent of the Company; and, in general, the Manager shall perform all duties as may be prescribed by the Members from time to time. Unless the Members otherwise prescribe, the Manager may carry out any or all of ~~her/~~his or her duties through other persons to whom he or she may delegate responsibilities. Subject to any rights of the Members set forth in this Agreement or the Statute, the specific authority and responsibility of the Manager shall also include the following:

(a) The Manager shall effectuate this Agreement and the regulations and decisions of the Members. ~~The Members agree to revisit this Operating Agreement and the authority and responsibility of the Manager every twenty-four (24) months from the date hereof.~~

(b) The Manager shall direct and supervise the day-to-day operations of the Company.

(c) The Manager, within such parameters as may be set by the Members, shall establish such charges for services and products of the Company as may be necessary to provide adequate income for the efficient operation of the Company.

(d) The Manager, within the budget established by the Members, shall set and adjust wages and rates of pay for all personnel of the Company and shall appoint, hire and dismiss all personnel and regulate their hours of work.

(e) The Manager shall keep the Members advised in all matters pertaining to the operation of the Company, services rendered, operating income and expense, financial position, and, to this end, shall prepare and submit a report to the Members at each regular meeting and at other times as may be directed by the Members.

(f) ~~Kaminski~~David Bao ("Bao") shall be designated the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the code~~; or if the Manager is not a Member, the "tax matters partner" shall be a Member that is designated as such by vote of the Required Majority~~. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other ~~member~~Member to become a "notice partner" ~~with in~~within the meaning of Section 6223 of the Code. Any ~~Member~~person who is designated "tax matters partner" shall inform each ~~other~~ Member of all significant matters that may come to his, her or its attention in his, her or its capacity as "tax matters partner" by giving notice thereof on or before the fifth (5th) business day after becoming aware thereof and, within that time, shall forward to each ~~other~~ Member copies of all significant written communications he, she or it may receive in that capacity. The "tax matters partner" shall promptly furnish to each ~~member~~Member a copy of each tax return prepared and filed in accordance with Sections 8.4 and 8.5, together with any schedules or other information that the ~~member~~Member may require in connection with the Member's own tax affairs.

10.2 *Executive Officers*. ~~Kaminski~~ Bao is hereby appointed to serve as Manager, President, Secretary and ~~Co-Chief~~Chief Executive Officer and to act in accordance with the provisions of Section 10.1~~ above~~. Bao ~~is hereby appointed to serve as Secretary and Co-Chief Executive Officer. Each of Kaminski and Bao~~ shall hold office in accordance with the provisions of ~~section~~Section 10.4~~ below~~.

10.3 *Other Officers*. The Company may, at the discretion of Members holding the Required Majority, have additional ~~Officers~~officers, including, without limitation, one or more ~~Vice-Managers~~Vice Managers (who may also be ~~vice-presidents~~vice presidents), one or more Assistant Secretaries and a Treasurer and one or more Assistant Treasurers. Officers need not be selected from among the Members. One person may hold two or more offices~~, except one person may not hold both the office of Manager and the office of Secretary~~. When the incumbent of an office is (as determined by the incumbent himself or herself or by the Members) unable to perform the duties of such office, or an office is vacant (both such situations referred to hereafter as the ~~"~~"absence~~"~~" of the ~~Officer~~officer), the duties of the office shall be performed by the person specified by the Members.

10.4 *Election and Tenure*. The ~~Officers~~officers of the Company shall be elected annually by the

Members at the annual meeting. Each ~~Officer~~officer shall hold office from the date of his or her election until the next annual meeting and until his or her successor shall have been elected, unless he or she shall sooner resign or be removed.

10.5 *Resignations and Removal.* Any ~~Officer~~officer may resign at any time by giving written notice to the Manager or to all of the Members, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Any ~~Officer~~officer (including the Manager) may be removed at any time by the Members with or without cause.

10.6 *Vacancies.* A vacancy in any office may be filled for the unexpired portion of the term by the Members.

10.7 *Salaries.* The salaries of the officers, if any, shall be fixed from time to time by a Required Majority and no officer shall be prevented from receiving such salary by reason of the fact that he or she is also a Member of the Company.

10.8 *Approval Required.* Notwithstanding anything herein to the contrary, the Manager must consult with and obtain approval of at least ~~seventy-five~~sixty percent (~~75~~60%) of the LLC Interests prior to taking any of the following actions:

(a) Hiring or terminating, or increasing the salary, wages or other compensation rates, or making or granting any increase in benefits, of, any employees of the Company;

(b) Establishing the Company's annual budget and each construction budget, or incurring any expenditures that deviate more than five percent (5%) ~~percent~~ from the Company's annual budget or cost more than $5,000;

(c) Adding or removing members of the Company;

(d) Incurring debt in excess of $10,000;

(e) Making any drastic or material change in the business, operations or business plan for the Company;

(f) Dissolving, liquidating or filing to terminate the business or cease operations of the Company;

(g) Filing for bankruptcy or for receivership;

(h) Issuing any LLC Interests or other equity interests (including securities convertible into equity interests) of the Company;

(i) Entering into or amending any agreement with any affiliate or related party of the Company or any Member;

(j) Amending or modifying, or waiving of any provision of, this Agreement, the Certificate of Organization of the Company or any other organizational document of the Company,

or otherwise change the form of the Company;

(k) Acquiring or owning any debt or equity interests of any person or forming or establishing any subsidiary;

(l) Selling, assigning or otherwise transferring any properties or assets of the Company other than the sale of inventory in the ordinary course of business; or

(m) Initiating or settling any legal proceeding, arbitration, audit, investigation or similar claim or action.

Notwithstanding anything herein to the contrary, the Manager can authorize payments/ or disburse checks for any construction project so long as the specific project has been approved as provided for herein and the expenditure is within the construction budget adopted for each such construction project.

ARTICLE 11.

MISCELLANEOUS

11.1 *Notice.* Any notice required or permitted to be given pursuant to the provisions of the Statute or this Agreement shall be effective as of (a) the date personally delivered, (b) if sent by mail, three (3) business days following the date deposited with the United States Postal Service, prepaid and addressed to the intended receiver at his, her or its last known address as shown in the records of the Company, or (c) if sent by electronic mail, upon the successful transmission by the sender to the intended receiver at his, her or its last know e-mail address as shown in the records of the Company.

11.2 *Waiver of Notice.* Whenever any notice is required to be given pursuant to the provisions of the Statute or this Agreement, a waiver thereof, in writing, signed by the persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

11.3 *Indemnification by Company.* To the fullest extent permitted by law, the Company shall indemnify and hold harmless any person who was or is a party defendant or is threatened to be made a party defendant to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigation (other than an action by or in the right of the Company) by reason of the fact that he, she or it is or was a Member of the Company, the Manager, officer, employee or agent of the Company, or is or was serving at the request of the Company, against any and all losses, claims, damages, expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him, her or it in connection with such action, suit or proceeding if the party to be indemnified acted in good faith and in a manner he, she or it reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal action or proceeding, had no reasonable cause to believe his, her or its conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he, she or it reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe

that his conduct was unlawful.

11.4 *Indemnification Funding.*

(a) To the fullest extent permitted by law, expenses incurred by an indemnified party in defending any claim, demand, action, suit or proceeding subject to Section 11.3 shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon the receipt by the Company of an undertaking by or on behalf of the indemnified party to repay such amount unless it shall be determined that such person is entitled to be indemnified as authorized in Section 11.3.

(b) The indemnification of Section 11.3 shall be in addition to any other rights of an indemnified party under any agreement, pursuant to any vote of the Required Majority, as a matter of law or otherwise, and shall continue as to an indemnified party who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and personal representatives of the indemnified party.

(c) Any indemnification under Section 11.3 shall be satisfied solely out of the assets of the Company. The Company may obtain insurance in order to satisfy its indemnification obligations, either in whole or in part. In no event may an indemnified party subject any Member to personal liability by reason of these indemnification provisions. An indemnified party shall not be denied indemnification under Section 11.3 because the indemnified party had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement.

11.5 *Anticipated Transactions.* It is anticipated and acknowledged that the Members and ~~Officers~~officers of the Company will have other legal and financial relationships in addition to their relationship with the Company. It is expressly understood and agreed that no Member shall be required by this Agreement to devote his, her or its entire time or attention to the business of the Company or shall be restricted by this Agreement in any way from participating in other businesses or activities. No Member nor any of its affiliates will have any obligation to offer first to the Company any business opportunity or venture of any kind, nature or description that such Member or any such affiliate, as the case may be, may wish to pursue from time to time, independently or with others. The provisions of this Section 11.5 shall not supersede any agreement between the Company and any Member contained in any employment agreement, consulting agreement, confidentiality agreement, distribution agreement, non-competition agreement or other agreement.

11.6 *Further Assurances.* Each of the parties agrees to take such further actions and execute and deliver such documents as may be reasonably necessary or appropriate to effectuate the terms of this Agreement.

11.7 *Applicable Law.* The validity, construction, interpretation, and effect of this Agreement shall be governed by Pennsylvania law, without regard to principles of choice of laws.

11.8 *Construction.* The section and paragraph headings of this Agreement are for convenience of reference only and do not form a part of the terms, conditions, or covenants of this Agreement or give full notice thereof. As used in ~~the~~this Agreement, the masculine includes the feminine, and the single includes the plural. The words "include", "including" and "or" mean without limitation by reason of enumeration. The words "herein", "hereto", "hereof" and words of similar import refer to this Agreement as a whole and not to any particular section or paragraph hereof.

~~single includes the plural.~~

11.9 *Benefit.* This Agreement shall be binding on, and inure to the benefit of, the parties hereto and their respective heirs, executors, administrators, successors, and permitted assigns.

11.10 *Entire Agreement.* This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof, no other representations or covenants having induced any party to enter into this Agreement.

11.11 *Severability.* If any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other document.

11.12 *Definitions.* As used herein, the following terms shall have the following meanings:

(a) The term "person" shall include any individual, corporation, partnership, association, trust, joint stock company~~ or~~, unincorporated organization~~;~~ or other entity.

(b) The term "bankruptcy" of a person shall be deemed to have occurred upon the happening of any of the following: (i) the filing of an application by such person for, or a consent to, the appointment of a trustee of its or his assets; (ii) the filing by such person of a voluntary petition in bankruptcy or the seeking of relief under Title 11 of the United States Code, as now constituted or hereafter amended, or the filing of a pleading in any court of record admitting in writing ~~its or~~ his, her or its inability to pay ~~its or~~ his, her or its debts as they come due; (iii) the making by such person of a general assignment for the benefit of creditors; (iv) the filing by such person of an answer admitting the material allegations of, or ~~its or~~ his, her or its consenting to, or defaulting in answering, a bankruptcy petition seeking relief under Title 11 of the United States Code, as now constituted or as hereafter amended; or (v) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such person a bankruptcy or for relief in respect of such person or appointing a trustee of ~~its or~~ his, her or its assets, and such order, judgment or decree continue unstayed and in effect for any period of sixty (60) consecutive days.

(c) The term "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement.

11.13 *Counterparts.* This Agreement may be executed in counterparts which when taken together shall constitute one agreement binding on all the parties notwithstanding that all the parties are not signatories to the same counterpart. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic transmission (including in Adobe PDF format) shall be effective as delivery of a manually executed counterpart to this Agreement.

11.14 *Confidentiality.* Each Member will keep in strict confidence, and will not, directly or indirectly, at any time: (a) disclose, divulge or make accessible to any person any trade secrets or other intellectual property or confidential business, proprietary and technical information of the Company or any of its licensees, vendors or customers, whatever its nature and form and without limitation as to when or how the Company may have acquired such information, including the Company's unique selling and servicing methods and business techniques, vendor, licensee and

product information, customer and prospective customer lists, other customer and prospective customer information and other business information and know-how, but excluding any information that is or becomes generally available to the public through no action of the person (including its representatives and agents) responsible for maintaining the confidentiality of such information) (collectively, "Confidential Information"), without the prior written consent of the Required Majority, except to the extent that such disclosure is required by any subpoena or other legal process; or (b) subject to the use of Confidential Information in connection with a Member's rights set forth in Section 11.5, use any Confidential Information for such Member's own account, for the account of any other person or to the detriment of the Company or its affiliates, without the prior written consent of the Required Majority. Upon request by the Company or its affiliates, each Member will deliver to the Company all tangible embodiments relating to the Confidential Information that such Member possesses or has under his, her or its control. Nothing herein is in any way intended to or adversely affect or impact Kaminski's consulting business unrelated to and outside the Company's business.

11.15 *Representations.*

(a) Kaminski represents and warrants to the Company and Bountiful Capital that, as of the date hereof: (i) this Agreement has been duly executed and delivered by Kaminski and, assuming due authorization, execution and delivery by Bountiful Capital, represents the legal, valid and binding obligation of Kaminski, enforceable against Kaminski in accordance with its terms, and no further action on the part of Kaminski is required in connection with the transactions contemplated by this Agreement; (ii) Kaminski has the capacity to execute and deliver this Agreement and to consummate the transactions contemplated by this Agreement; (iii) neither the execution and delivery of this Agreement by Kaminski nor the performance by Kaminski of ~~Kaminski's~~Kaminski's obligations under this Agreement will violate or conflict with any law or order; and (iv) no consent, waiver, approval, authorization, order or permit of, or declaration or filing with, or notification to, any person is required in connection with the execution and delivery by Kaminski of this Agreement or the consummation of the transactions contemplated by this Agreement~~; (v) except for the Existing Debt and the Member Note, the Company has no outstanding indebtedness; (vi) immediately prior to the execution of this Agreement, Kaminski is the record and beneficial owner of all of the equity interests of the Company and no other person has any right to acquire any equity interests of the Company; (vii) there are no outstanding legal proceedings, audits, investigations or similar claims or actions by or against the Company other than the claim that has been disclosed at the signing hereof against a contractor and pending in Lackawanna Court of Common Pleas; and (viii) the assets and properties currently owned, leased or licensed by the Company constitute all of the assets and properties used in or necessary to conduct the business of the Company, and the Company has good and marketable title to, a valid and enforceable leasehold interest in or a valid and enforceable license to all of its tangible assets and properties, free and clear of any liens (other than any liens arising under the Existing Debt).~~.

(b) Bountiful Capital represents and warrants to the Company and Kaminski that, as of the date hereof: (i) this Agreement has been duly executed and delivered by Bountiful Capital and, assuming due authorization, execution and delivery by Kaminski, represents the legal, valid and binding obligation of Bountiful Capital, enforceable against Bountiful Capital in accordance with its terms, and no further action on the part of Bountiful Capital is required in connection with the transactions contemplated by this Agreement; (ii) ~~Kaminski~~Bountiful Capital has the limited liability company power and authority to execute and deliver this Agreement and to consummate the transactions contemplated by this Agreement; (iii) neither the execution and delivery of this Agreement by Bountiful Capital nor the performance by Bountiful Capital of its obligations under this Agreement will violate or

conflict with any law or order; and (iv) no consent, waiver, approval, authorization, order or permit of, or declaration or filing with, or notification to, any person is required in connection with the execution and delivery by Bountiful Capital of this Agreement or the consummation of the transactions contemplated by this Agreement.

ARTICLE 12.

AMENDMENTS

12.1 *Amendments.* This Agreement may be altered, amended, restated, or repealed, and a new Agreement may be adopted, at any time or from time to time, pursuant to a vote under Section 2.8(b).

ARTICLE 13.

DISSOLUTION

13.1 *Events Causing Dissolution.* As required under the Statute, the Members agree that the Company shall be dissolved only upon the:

(i) written consent of all Membersa Required Majority;

(ii) upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member;

(iiiii) the occurrence of any other event which terminates the continued membership of a Member in the Company, including the carrying on of activities which contravene the stated purpose of the Company; provided, however, the parties agree that, upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which terminates the continued membership of a Member, the Company shall have the right to continue its business if within ninety (90) days following the dissolution event, the Remaining Members holding a majority of the then-outstanding LLC Interests held by all Remaining Members shall have consented to continue the business of the Company.

13.2 *Liquidation.* Upon the termination and dissolution of the Company, the Manager or, if there is no Manager, any person elected to perform such liquidation by the written consent of the Members shall proceed with the liquidation of the Company, and the proceeds of such liquidation shall be applied and distributed in the following order of priority:

(a) *First,* to the Members pro rata in accordance with their positive Capital Account balances, to the extent of such balances; and

(b) *Second,* to all Members pro rata in accordance with their relative Profit Percentages.

13.3 *Distributions in Kind.* In the event it becomes necessary to make a distribution of Company property in kind, such property shall be transferred and conveyed to the Members or their assignees so as to vest in each of them an interest in the whole of said property equal to their interests in the distribution of proceeds in accordance with Article 9 hereof. Any valuation of Company property shall be made by a firm of certified public accountants, appraisers or investment bankers selected by the Manager in his, her or its sole discretion.

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*

ARTICLE 14

LEGAL DISPUTES/DEADLOCK PROVISION

14.1 *Mediation.* In the event the Members are unable to resolve a matter and there is a deadlock, and/or a legal dispute arises between the Members in connection with this Agreement or the Company, the Members shall be required to first attempt to mediate the dispute via a neutral third-party mediator, with each Member paying for one-half of the mediator costs. The mediator shall be an experienced business attorney and/or retired Judge, chosen mutually by the Members. The mediation may occur remotely or in person.

14.2 *Arbitration.* In the event the Members are unable to select a mediator and/or mediation is unsuccessful, the Member seeking to resolve the legal dispute shall be entitled to file for arbitration with the American Arbitration Association (the "AAA"). Such arbitration shall be held remotely in front of one arbitrator chosen from a list of arbitrators provided by the AAA and mutually agreed to in writing by the parties, pursuant to the Commercial Arbitration Rules and Mediation Procedures of the AAA. If the parties cannot reach an agreement on an arbitrator within fifteen (15) days of receipt of the list provided by the AAA, then on the fifteenth (15th) day, the parties will convene a conference with the AAA case administrator (or such other AAA staff member as the AAA will make available). The claimant and the respondent will alternate striking one arbitrator from the list until one arbitrator is left, which such arbitrator will be appointed. If such arbitrator is unable or unwilling to serve, then the next to last candidate will be chosen. In any such legal action, the prevailing party shall be entitled to recover their reasonable attorney's fees and costs.

[Signature Page Follows]

*[Different first page setting changed from off in original to on in modified.].*
*[Link-to-previous setting changed from on in original to off in modified.].*

THE UNDERSIGNED, being all of the Members of ALLURE SALON GROUP, LLC, a Pennsylvania Limited Liability Company, have duly executed this Agreement on the day and year first written above.

(Del) Kaminski ____________

Karen Kaminski

BOUNTIFUL CAPITAL, LLC

By: (Del) B ____________

Name: David Bao

~~By:~~

~~Name: David Bao~~

Title: President

~~[Signature Page to Limited Liability Company Operating Agreement—Allure Salon Group, LLC]~~

**SCHEDULE A**

| Name | LLC Interests | Profit Percentage |
|---|---|---|
| Karen Kaminski | 352.94117 | 30.00000% |
| Bountiful Capital, LLC | 823.52942 | 70.00000% |

| ~~Name~~ | ~~Initial Capital Contribution~~ | ~~LLC Interests~~ | ~~Profit Percentage~~ |
|---|---|---|---|
| ~~Karen Kaminski~~ | ~~$[To Be Filled In]~~ | ~~600.00000~~ | ~~60.00000%~~ |
| ~~Bountiful Capital, LLC~~ | ~~$350,000~~ | ~~400.00000~~ | ~~40.00000%~~ |

*[Link-to-previous setting changed from on in original to off in modified.]*

| Summary report: Litera Compare for Word 11.3.1.3 Document comparison done on 3/26/2025 8:45:40 PM | |
|---|---|
| **Style name:** DL Default Redline | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Limited Liability Company Operating Agreement - Allure Salon Group, LLC - Executed.pdf | |
| **Modified filename:** A&R Limited Liability Company Operating Agreement - Allure Salon Group, LLC - v2.doc | |
| **Changes:** | |
| Add | 195 |
| ~~Delete~~ | 237 |
| ~~Move From~~ | 0 |
| Move To | 0 |
| Table Insert | 1 |
| ~~Table Delete~~ | 0 |
| Table moves to | 0 |
| ~~Table moves from~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 1 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 434 |